1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ELEAZAR VILLEGAS,

11              Plaintiff,              No. CIV S-00-1760 FCD GGH P

12        vs.

13   C.A. TERHUNE, et al.,              ORDER &

14              Defendants.             FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17              Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court are: 1) defendants' motion for summary judgment, filed on

19   March 23, 2005, to which plaintiff has filed an opposition; 2) plaintiff's request for sanctions,

20   filed on June 10, 2005, to which defendants have filed their opposition.

21   Complaint[1]

22              This action proceeds on the original complaint, filed on August 14, 2000.  Named

23   _____

24        [1]  The court borrows from its prior summary of plaintiff's allegations as set forth in the
     Findings and Recommendations, filed on July 14, 2004, recommending denial of plaintiff's
     motion for summary judgment, adopted by Order, filed on September 30, 2004.  The court also
25   sets forth these allegations in Findings and Recommendations, filed on July 29, 2003, adopted by
     Order, filed on September 12, 2003, and originally in Findings and Recommendations, filed on
26   February 22, 2002, adopted by Order filed on April 23, 2002, with a Memorandum.

                                         1

as defendants are Terhune,[2] Melching, Larson, Harris, and Gagnon.  Plaintiff alleges that

defendants Gagnon, Harris and Larson threatened plaintiff with reprisals if he continued to use

the administrative appeal process to resolve issues arising from the alleged inadequate appeal

process at Salinas Valley State Prison (SVSP).  Defendants Melching, Larson, Harris, and

Gagnon retaliated against him for attempting to resolve issues as to the prison grievance system

in his capacity as an elected member of the Men's Advisory Council (MAC) at Salinas Valley

State Prison by placing him on appeal restriction.  Complaint at pp. 4-5.  In a January 1, 1999

"class action administrative appeal," plaintiff had complained of the inadequacy of appeal

procedures at SVSP, claiming that illiterate inmates or those unable to read or write in English

were not provided with any assistance in preparing appeals, that staff failed to respond to

informal level appeals, and that staff retaliated against those who submitted appeals.  Id.

Plaintiff alleges that defendants Melching, Larson, Harris and Gagnon were

furious that plaintiff claimed that the prison's appeal procedures amounted to a denial of a

prisoner's right of access to the courts since the Prison Litigation Reform Act requires exhaustion

of administrative remedies prior to bringing suit.  Complaint, p. 5.  Plaintiff contends that he was

placed on appeal restriction by defendants Melching, Harris and Gagnon and was limited in a

memo to one administrative appeal per month without any counseling chrono, rules violation

report or other written notice of the basis of the restriction.  Id. at pp. 5, 8.  Plaintiff submitted an

administrative appeal on March 9, 1999 for defendants' allegedly retaliatory action; on May 5,

1999, plaintiff received a second level response, partially granting his appeal.  Id. at pp. 5-6.  On

\\\\\

---

[2]  As "plaintiff seeks, inter alia, prospective injunctive relief 'from defendants Melching and Terhune or their agents,'" and plaintiff has sued Terhune in both his individual and official capacities, "this court maintains jurisdiction in this case, over any successor in office, i.e., the current CDC Director Jeanne S. Woodford."  See Order, filed on Feb. 9, 2005, p. 6.  In their opposition to plaintiff's motion for sanctions, defendants identify John Dovey as the current Director of the Division of Adult Institutions of the re-named CDC, California Department of Corrections and Rehabilitation (CDCR).

May 24, 1999,[3] plaintiff submitted his appeal to defendant Melching, Chief of Inmate Appeals, for third-level review.  Id. at p. 6.  After repeated efforts to receive a response, by the time of filing his complaint, a third-level review decision had not been rendered and was more than a year overdue.  Id.  Plaintiff alleges the defendants engaged in a conspiracy by placing him on appeal restriction in retaliation for his actions in his MAC position and that their action has deprived him of access to the courts because defendants have refused to process his appeal at the third-level review, when exhaustion is required under the Prison Litigation Reform Act (PLRA), prior to bringing an action under 42 U.S.C. § 1983 in federal court.  He alleges that he has been thus deprived, in addition, of due process and subjected to cruel and unusual punishment.  Plaintiff also alleges that defendants Terhune and Larson violated his constitutional rights by failing to properly train, supervise, and discipline defendants Melching, Harris and Gagnon for placing him on the retaliatory appeal restriction for his activities as a member of the Men's Advisory Council at SVSP.

Motion for Sanctions

Although filed after defendants' motion for summary judgment, the court will consider first plaintiff's motion for sanctions because it arguably implicates his ability to have sufficient access to his legal property adequate to oppose the pending dispositive motion.

Throughout this litigation, this court has had to address plaintiff's recurring claims of inadequate access to his legal materials.  See Findings and Recommendations, filed on July 29, 2003, adopted by Order, filed on September 12, 2003; Order & Findings and Recommendations, filed on July 14, 2004, adopted by Order filed on September 30, 2004; Order, filed on September 24, 2004; Order, filed on February 9, 2005; Order, filed on March 15, 2005; Order, filed on April 26, 2005.

\\\\\

---

[3]  The third level appeal in plaintiff's exhibits indicates the date of the appeal as May 26, 1999, and the date received as June 9, 1999.  Exhibit E to opp.

3

1    In the Order, filed on February 9, 2005,[4] plaintiff's then pending preliminary

2 injunction motion, construed as a motion for a protective order, was:

3    denied insofar as it is mooted by plaintiff's transfer to Pleasant
     Valley State Prison, but granted to the extent that the current CDC
4    director, a defendant in her official capacity only, must require
     CDC employees at PVSP to allow plaintiff meaningful access to
5    his stored legal property relevant to this case, prior to and after the
     March 29, 2005 trial confirmation hearing, in order so that plaintiff
6    may prepare for trial.

7 Order, filed on February 9, 2005, p. 8.

8    Later, in granting plaintiff's subsequent request for an extension of time to

9 respond to the pending motion for summary judgment and denying without prejudice his request

10 for sanctions for the alleged failure of PVSP prison staff to comply with the February 9, 2005

11 Order, the court cautioned:

12    Although the pretrial conference and trial dates were vacated
      pending adjudication of defendants' March 23, 2003 motion for
13    summary judgment, PVSP prison officials should not read the
      February 9, 2005 order so narrowly as to allow them to prevent
14    plaintiff from access to his stored legal property so that he is
      unfairly hampered in his efforts to prepare an opposition to the
15    defendants' motion.  However, plaintiff must do more than simply
      complain that he is being prevented entirely from access to his
16    stored legal property.  He must submit evidence of having sought
      access to the said legal property that shows when, by whom, for
17    what reason and for what duration he has been denied access.

18 See Order, filed on April 26, 2005, pp.1-2.

19    In his pending request for sanctions and a contempt order, plaintiff states that on

20 May 10, 2005, he had an interview with Capt. Petrick (non-defendant at PVSP) about his

21 complaints of retaliation by Petrick's subordinate PVSP correctional staff (not defendants),

22 specifically, Sergeants Ward and Sanchez and Correctional Officers (C/Os) Huckabay, Hatten,

23 Diaz, Tucker and Rangel.  Motion for Sanctions (MS), p. 2.  Petrick told plaintiff he had spoken

24 with Sanchez, the litigation coordinator, about the court's order with respect to plaintiff's being

25 ─────────────

26    [4] This order was affirmed on defendants' motion for reconsideration.  See Order, filed on
     March 15, 2005 (in the first alternative, defendants' motion was denied as untimely).

4

allowed access to his legal property and told plaintiff to give Sanchez a request for interview to receive access.  Id.

Plaintiff told Petrick that Ward, Sanchez and Huckabay intentionally arrange the escort officers so that plaintiff is escorted by the ones about whom he has submitted complaints, i.e., on May 4, 2005, plaintiff filed a staff complaint against Tucker for confiscating plaintiff's legal material.  MS, p.2.  Petrick seemed sympathetic and acknowledged "'problematic'" officers against whom he was powerless because of the powerful guards' union.  MS, pp. 2-3.

On May 27, 2005, plaintiff had an interview with (non-defendant) Lieutenant D. Allen, concerning staff complaints against Huckabay, Sanchez, Ward and others, explaining that he was being targeted for harassment by C/Os Rangel, Hatten, Tucker and others in the form of unnecessary force, confiscating legal property and "constantly harassing plaintiff."  MS, p. 3, Exhibit (Exh.) A.  Exhibit A is a compendium of inmate appeals filed by plaintiff, some of which relate to his access to legal property.

In his far-ranging appeal filed on 2/2/05, plaintiff complains, inter alia, that C/O Daiz [sic] denied plaintiff "supplies, showers and law library."  On March 3, 2005, plaintiff complains of being CTQ (confined to quarters) for ten days but not being found guilty of anything.  He includes a copy of a CDC-128 B chrono, dated February 14, 2005, stating that during the ten-day confinement of plaintiff for being disruptive at a hearing, plaintiff would only be allowed out for priority and medical ducats (and for showers three times a week).  MS, Exh. A.

In an April 28, 2005 602 appeal, plaintiff complained, inter alia, C/O Diaz would not pick up plaintiff legal mail, rather having an inmate, a porter, do it.  On May 4, 2005, plaintiff filed a grievance complaining that various staff, including C/O Tucker had harassed him, that Tucker told plaintiff he did not like "'jailhouse lawyers,'" that Tucker harasses him with searches, and that, on April 21, 2005, Tucker and two other officers searched plaintiff, among others, reading and taking some of plaintiff's legal papers.  Id.

5

In a May 26, 2005 appeal, plaintiff complains, among other issues, of what he considers an inadequate response by Capt. Petrick, as well as the warden, etc., to the issues plaintiff raised with him, concerning harassment by several officers.  Petrick's May 19, 2005 response appears to list and address the grievances plaintiff made known to him during the May 10, 2005 interview, but does not make specific reference to the individuals about whom plaintiff complained; Petrick does note plaintiff's 27 appeals at PVSP (to that date), explains a delay in issuance of quarterly packages and encourages plaintiff to continue using the appeals process.  Id. As his Exh. B, plaintiff submits a May 19, 2005 third level director's level decision, concerning another inmate, wherein that inmate had apparently complained that C/O Rangel, among others, had "illegally confiscated" that other inmate's legal material during a search.

Plaintiff is fearful he is being set up by escorting officers to be falsely accused of misconduct.  On June 2, 2005, plaintiff told Sgt. Sanchez that C/O Hatten threatened and harassed him; nevertheless, Sanchez told plaintiff Hatten would escort him to his stored legal property.  C/O Hatten and C/O Garcia began to harass plaintiff; Hatten had Garcia conducted a "rough search" of plaintiff, using unnecessary force, in an effort to provoke plaintiff.  MS, p. 4.

When plaintiff asked Sanchez to intervene, both Sanchez and Hatten replied that they were only required to provide plaintiff access to his stored legal property and the manner in which they did it was their concern.  MS, p. 4.  At that point, plaintiff was to be subjected to a strip search to which plaintiff objected; plaintiff was refused access to his legal property.  MS, pp. 4-5.  Plaintiff was strip searched and humiliated in front of female officers.  MS, p. 5.  C/O Hernandez taunted and threatened plaintiff that he would be subject to harassment until he stopped his litigation.  Id.  Plaintiff was told by Ward, Hatten, Tucker and Rangel that he would be given a rough strip search every time he sought to review his legal property.  MS, pp. 5-6.

The next day, June 3, 2005, plaintiff was subjected to a harassing search by C/O Tucker and another officer.  MS, p. 6.  Tucker then read plaintiff's confidential legal papers and warned that the strip search of the day before was just the beginning.  Id.

1    Plaintiff complains that agents of defendants are systematically harassing him due

2 to his litigation against the CDC and seeks and order imposing sanctions and holding defendant

3 Woodford[5] in contempt for willful lack of compliance with the court's order requiring that

4 plaintiff receive regular access to his stored legal property.  MS, p. 6.

5 Defendants' Opposition[6]

6    Defendants assert that no defendant in this action has asked anyone to interfere

7 with plaintiff's litigation and that all but one is "happily retired."  Opposition (Opp.), p. 2; Dovey

8 Declaration (Dec.); Terhune Dec.; Melching Dec., Gagnon Dec., Harris Dec.

9    Defendants aver that none of the PVSP staff named by plaintiff have in any way

10 violated plaintiff's rights; rather plaintiff has sought to use his litigation to flaunt prison

11 procedures and threaten staff with more litigation.  Opp., p. 2; Garcia Dec., Hurl Dec., Sanchez

12 Dec., Herrera Dec., Hatten Dec., Hernandez Dec., Tucker Dec., Huckabay Dec., Ward Dec.;

13 Exhs. A-F.

14    Plaintiff has been allowed access to his legal materials when he has sought it and

15 has been provided with an escort to R&R (Receiving and Release) within 48 hours of any request

16 to use his excess legal materials.  Opp., p. 2, Exh. D; Hurl Dec.; Sanchez Dec.  However,

17 plaintiff has refused to access his legal material and returned to his cell instead.  Opp., p. 2, Exhs.

18 A, C, D.

19    Plaintiff, according to defendants, has not been falsely accused of assault by PVSP

20 staff, had his legal material confiscated, been strip searched in front of female officers, threatened

21 with rough searches.  Opp., p. 2, Tucker Dec., Garcia Dec., Hatten Dec., Rangel Dec., Hernandez

22 Dec., Huckabay Dec., Ward Dec.

23

24    [5] Pursuant to Fed. R. Civ. P. 25(d)(1), CDCR Director John Dovey, in his official
capacity is automatically substituted in as a defendant.

25

26    [6] Defendants' motion for leave to file opposition to motion for sanctions four days late is
granted.

1     Finally, defendants protest the legitimacy of any basis for imposing sanctions on

2  CDCR Dovey because plaintiff's injunctive relief claims were mooted when his incarceration at

3  SVSP ended.  Opp, pp. 2-3.

4     In their declarations, defendants swear under penalty of perjury that they have

5  done nothing to impede plaintiff in his efforts to litigate this case.  Each of the non-defendant

6  PVSP staff also declare that they have not impeded plaintiff's access to his stored legal property.

7     Sgt. Hurl, Correctional Sgt. at R&R at PVSP, in one of his two affidavits, declares

8  that plaintiff informed him that his "primary goal during access to his property was to purge

9  inactive casework prior to his parole in the spring."  Hurl Dec., dated 2/24/05.  Hurl states that

10  each time plaintiff has been escorted to R&R for legal access, he has "terminated access" without

11  using all of the time allotted for him to access the property, specifically noting times that plaintiff

12  accessed his stored files on December 16, 2004, December 27, 2004, February 18, 2005, wherein

13  plaintiff accessed his property on 0845 to 0955 hours; 0830-1040 hours and 0900 to 1300 hours

14  respectively, rather than the full span of time he was allowed 0800 hours to 1530 hours.  Id.

15     Sgt. Hurl states that per PVSP procedure, inmates may access stored legal

16  materials at a minimum of twice per month.  Id.  Elsewhere, he states that access to legal

17  property is normally granted within 48 hours "without exception."  Id.  It is unclear whether or

18  not an inmate must show a court-ordered deadline for such access.  Hurl states that Sgt. Herrera,

19  Facility A Program Sgt. (apparently plaintiff's facility), informed him that plaintiff rarely asks for

20  a legal property appointment but does not appear to have directly answered Hurl's question as to

21  whether at any time plaintiff had not been allowed access to his property, stating only that legal

22  access is normally granted within 48 hours.  Id.  Sgt. Hurl asserts that plaintiff's claims that he

23  does not have adequate legal property access based on his review of the relevant records,

24  interviews with plaintiff and Sgt. Herrera's statements.  Id.

25     In his second declaration, Sgt. Hurl states that the R&R property officer told him

26  that plaintiff had not made any written request for access to his legal property, "as of the time" he

interviewed her (which time he does not set forth).  Hurl Dec., dated 5/2/05.  There is no record of plaintiff having been ducated to R&R; inmates are ducated for access to legal property within 48 hours upon request unless unspecified factors preclude such access.  Id.  In apparent contrast to the twice a month access mentioned in his earlier declaration, Sgt. Hurl states that inmates are allowed access to legal property once a week for active cases per the departmental operations manual.  Id.

Sgt. Hurl declares that neither he nor any member of his staff has denied plaintiff access to his stored legal property or conspired to interfere with his ability to litigate his court cases.  Id.

PVSP Correctional Sgt. Herrera states that she was assigned to Facility A as program sergeant from February 9, 2004 to March 7, 2005, during which time she spoke with plaintiff many times.  Herrera Dec., dated 5/3/05.  Plaintiff spoke to Herrera a few times about his property and each time he did so, she directed an escort officer to contact R&R to arrange for plaintiff to access his legal property.  Id.  Sgt. Herrera states that she did not prevent plaintiff's access to his stored legal property, nor did she conspire with anyone else to do so.  Id.

PVSP Correctional Sgt. Sanchez states that plaintiff became disruptive during a CDC-115 hearing on Feb. 22, 2005, after which he was confined to quarters for ten days.  Sanchez asserts that plaintiff was escorted to R&R for legal access during that time to exchange legal documents he needed.  Sanchez Dec., dated 5/2/05.  Sanchez does submit any documentation to support his representation that plaintiff had access to his stored legal property during that period.

Sanchez states that during the week of April 11, 2005, he asked plaintiff if he had been able to exchange his legal property at R&R to which plaintiff said he had not.  Id.  He told plaintiff to tell C/Os in his building when he needed to make an exchange of legal property so arrangements for an escort to R&R could be arranged.  Id.  Sgt. Sanchez declares that he has not hindered plaintiff's access to his legal property or conspired with anyone else to do so.  Id.

1    PVSP C/O Hatten, assigned to plaintiff's yard, declares that he has not harassed

2    plaintiff with regard to his inmate appeals or court cases, has never threatened him or used

3    unnecessary force against him or confiscated any legal property from him, has never told C/O

4    Garcia to do a rough search on him or witnessed such a search by Garcia of plaintiff.  Hatten

5    Dec., dated 6/30/05.  He states that he never refused to escort plaintiff to R&R so that he could

6    access his stored legal property.  Id.

7    PVSP C/O Hernandez, who works on the yard where plaintiff is housed, states

8    that on June 2, 2005, neither Sanchez nor Hatten told him to strip search plaintiff in front of any

9    female officers and declares that he has never strip searched plaintiff in a degrading or

10   humiliating manner.  Hernandez Dec., dated 6/30/05.  Interestingly, C/O Hernandez does not

11   deny that he did conduct a strip search on plaintiff on that day, nor does he state that he did not

12   do it in front of females staff.  In their opposition, defendants have included several chronos,

13   which it does not appear were properly authenticated in any of the numerous declarations

14   submitted.  The court includes reference to them, however, because defendants have included

15   them while they do not particularly support the representations of PVSP staff completely and in

16   some part confirm what plaintiff has averred.

17   In two different chronos, dated June 2, 2005, Hatten and Garcia each state that

18   plaintiff on that day was directed to roll down his pant legs, after which they state that they were

19   going to escort plaintiff to R&R to exchange some of his legal material.  Garcia and Hatten aver

20   that Garcia performed a clothed body search and placed plaintiff in handcuffs.  Plaintiff told Sgt.

21   Sanchez that he would not go to R&R because he was being harassed, and he threatened to file a

22   law suit.

23   A little later that same morning, in another chrono, C/O Hernandez states that he

24   conducted an "unclothed body search" of plaintiff as plaintiff was being processed back to his

25   facility, which plaintiff called "demeaning and inhumane."  Hernandez noted plaintiff's

26   "antisocial behavior" and believed plaintiff "began to display illusions of grandeur by using legal

1    jargon...."  Hernandez states that he had never met plaintiff before and that plaintiff made a

2    "racial remark" about Hispanics.  In his chrono, Hernandez also describes plaintiff as, in his

3    opinion (even though he had never met plaintiff before), needing psychological evaluation

4    because plaintiff was unable to carry on a "normal conversation without making some sort of

5    legal threat as to why he is being wronged...."  Opp., attachment, "psych referral" chrono by

6    Hernandez, dated 6/2/05.  Neither in the "psych referral" or in his declaration does Hernandez

7    express the reason for the strip search or the circumstances surrounding it.

8           C/O Garcia, who works on the yard where plaintiff is housed, declares that neither

9    he nor C/O Hatten harassed plaintiff on June 2, 2005, nor did Hatten tell him to conduct a rough

10   search of plaintiff, nor did he conduct such a search, and he has not refused to take plaintiff to

11   R&R to use his legal property stored there.  Garcia Dec., dated 7/5/06.  Other than stating that he

12   has not refused to allow plaintiff access to his legal property, unlike most of the other

13   declarations, this one is limited to denying plaintiff's specific allegations with respect to Garcia's

14   actions on a specific day, June 2, 2005, but does not make broader statements about whether or

15   not he has ever harassed or threatened the plaintiff or whether or not he has ever conducted an

16   unnecessary search of plaintiff.

17          PVSP C/O Tucker who works where plaintiff is housed, declares that he has had

18   no part in the harassment of plaintiff or impeding him in any way from litigating this case, nor

19   has he threatened plaintiff with a rough search whenever plaintiff wants to access his stored legal

20   property.  Tucker Dec., dated 6/30/05.  He denies plaintiff's claims that he targeted plaintiff for

21   harassment on 6/3/05.  Id.

22          PVSP Correctional Sgt. Huckabay, a Search and Escort Officer where plaintiff is

23   housed, has never harassed plaintiff or hindered his efforts to litigate his cases or threatened to

24   perform rough strip searches on him or performed any such searches on him.  Huckabay Dec.,

25   dated 6/30/05.  Huckabay declares that not only has he never assigned any member of the staff to

26   escort plaintiff who has a history of animosity toward plaintiff, he does not even know of any

1  staff who harbors such animosity toward him; he assigns whatever staff is available for escorts.

2  Id.

3          Similarly, Correctional Sgt. Ward, who works where plaintiff is housed, has never

4  told plaintiff he would not allow him access to his stored legal property.  Ward Dec, dated

5  6/30/05.  Neither has C/O Rangel, who works on the yard where plaintiff is housed, ever

6  harassed plaintiff or hindered him in any way from accessing his legal property.  Rangel dec.,

7  dated 7/6/05.

8          As noted in their various declarations, those of the defendants who have filed

9  declarations in opposition to plaintiff's motion for sanctions, Dovey, Terhune, Gagnon,

10  Melching, have uniformly sworn that they have in no way interfered with plaintiff's prosecution

11  of this action.

12  Discussion

13          Much of the grievances plaintiff has attached to his motion concern allegations

14  unrelated to plaintiff's access, or lack thereof, to legal property for purposes of proceeding in this

15  litigation.   In fact, plaintiff does not specifically assert in this motion or in his opposition to

16  defendants' dispositive motion that his access to his legal property has been so deficient that he

17  was unable to compose an opposition to the pending motion for summary judgment.  He neither

18  invokes, nor appears to seek to invoke, Fed. R. Civ. P. 56(f)[7]

19          On the other hand, as to defendants' argument that the Director of CDC (or

20  CDCR) is not within the court's jurisdiction as a defendant in his (or her) official capacity in this

21  action, it has been resolved that the Director is, indeed, sued herein only in an official capacity

22  \\\\\

23

24          [7] "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the

25  court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is

26  just."  Fed. R. Civ. P. 56(f).

1   for prospective injunctive relief and that is the law of the case.[8]  See Orders filed on 2/9/05 and

2   on 3/15/05.

3          The documents before this court indicate that it is likely that there is some

4   disingenousness on the part of both plaintiff in this case and on the part of PVSP staff, but not on

5   the part of the defendants in this litigation.  As noted, plaintiff has claimed throughout this  entire

6   case that he has not received the access that he believes he is due and the court structured orders

7   such that plaintiff's needs in order to proceed in this case have been met.

8          Although plaintiff has been more specific in the allegations in his motion for

9   sanctions than in prior motions about his alleged lack of access to his legal property, these

10  allegations had been adamantly, although not entirely convincingly, opposed by the particular

11  participants he accuses.  Plaintiff by his motion very much appears to want this court to act to

12  sanction PVSP staff for alleged non-compliance with his interpretation of this court's mandate

13  that plaintiff be allowed access to his stored legal property relevant for this action.  He does not,

14  however, allege specifically that the access that he has been allowed is so deficient that he has

15  been unable to construct an opposition or that more access to his stored legal property would

16  enable him to more vigorously and effectively oppose the dispositive motion.   Plaintiff was

17  granted great latitude by this court to file and serve his opposition to the March 23, 2005 motion

18  for summary judgment and to file and serve a reply to defendants' opposition to his motion for

19  sanctions.  See Order, filed on November 9, 2005.  Plaintiff chose not file a reply to defendants'

20  opposition to his motion for sanctions, after having requested an extension of time to do so and

21  having been granted the extension.  As to opposing the motion for summary judgment when he

22

23          [8] Once a decision of law is made, it becomes the "law of the case," and absent clear error
    or changed circumstances should not be changed.  See United States v. Estrada-Lucas, 651 F.2d
24  1261, 1263-64 (9th Cir.1980).  The law of the case doctrine provides that "a court is generally
    precluded from reconsidering an issue that has already been decided by the same court, or a
25  higher court in the identical case."  United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998),
    quoting United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and
26  citation omitted).

did file it, on November 16, 2005, he was granted further latitude to serve the opposition, for

which service he had failed to provide proof.[9]  See Order, filed on December 21, 2005.[10]

Defendants have provided some documentary evidence by PVSP staff adequate to

counter plaintiff's claims that he has been denied all of the access that he requires by, for

example, demonstrating that plaintiff did not always make full use of the time allotted to him to

review or exchange the legal property he had stored with that that he had stored in his cell.

Although the court is not entirely satisfied by the representations made by the

PVSP staff with regard to that staff's compliance with the court's order, requiring plaintiff's

access to his relevant stored legal property, neither has plaintiff made a sufficiently convincing

case for this court to grant his motion and impose sanctions.  The court will not order an

evidentiary hearing on this collateral issue.  Plaintiff's motion for sanctions and for an order of

contempt will be denied.

Motion for Summary Judgment

Defendants move for summary judgment on the grounds that 1) plaintiff has no

Fourteenth Amendment due process right to a particular grievance procedure; 2) defendants

imposed the grievance restriction for legitimate penological, not retaliatory, reasons and the

restriction neither absolutely prohibited plaintiff from filing grievances or chilled him from doing

so; 3) plaintiff's conspiracy claims should be dismissed for lack of evidence; and 4) defendants

are entitled to qualified immunity as to damages.  Motion for Summary Judgment (MSJ), pp. 4-

12.

Plaintiff, in opposition to the motion, argues that in his MAC capacity, he filed

several administrative appeals about how staff instigated race-based prisoner conflicts, physically

---

[9] Plaintiff discharged this order by his filing of December 30, 2005.

[10] Moreover, this was not the first time plaintiff had been cautioned of the necessity to serve any document for which he sought the court's consideration.  See Order, filed on November 8, 2004.

1    assaulted prisoners, set up prisoners to be attacked by other prisoners, and defendants Gagnon,

2    Harris and Larson covered up the investigations.  Opposition (Opp.), p. 3.  Defendants Gagnon

3    and Harris, as well as non-defendants Moore and Potteiger threatened plaintiff he would be

4    attacked by gangmembers if he continued to litigate and press his MAC agenda.  Id.   The court

5    notes that plaintiff provides no exhibits in support of these contentions, nor clarifies why he

6    seeks to implicate those not parties to this action.  Plaintiff contends that the appeal restriction

7    and the reprisals plaintiff suffered "chilled" his rights.  Id.   Plaintiff submitted written

8    complaints to defendants Larson, Harris and Melching complaining that his safety was being

9    jeopardized and that defendants Gagnon and Harris, among others unnamed, were failing to

10   protect him.  Opp., p. 4.  Defendant Harris' 1/25/99 response basically ignored plaintiff's

11   concerns; Harris initiated the appeal restriction with the warning that letters to appeals office,

12   warden, CDC Director, and others would be considered grounds for extending the appeal

13   restriction.  Id.   Defendants Harris and Gagnon told plaintiff that this restriction was their way of

14   "shutting him up," and they were tired of plaintiff bringing the F.B.I. and judicial scrutiny to the

15   prison.  Opp., p. 4.  Again, plaintiff offers no evidentiary support for these allegations.  Plaintiff

16   was assaulted by gangmembers thereafter, receiving permanent injuries; one of the officers who

17   set him up was one known to be a "dirty cop" (but not a defendant herein).  Id.   Plaintiff

18   conclusorily claims that he has presented sufficient evidence of conspiracy; he also avers that

19   defendants have only cited pre-PLRA case law, and that the computer generated read out of his

20   appeal history does not constitute the actual appeals to show that plaintiff abused the appeal

21   process.  Opp., pp. 2, 5-6.

22          *Legal Standard for Summary Judgment*

23          Summary judgment is appropriate when it is demonstrated that the standard set

24   forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

25   there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

26   as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

1   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

2   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party

4   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8   genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

9   56(e) advisory committee's note on 1963 amendments).

10          In resolving the summary judgment motion, the court examines the pleadings,

11   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

13   477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

14   placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

15   at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

16   opposing party's obligation to produce a factual predicate from which the inference may be

17   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

18   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

19   party "must do more than simply show that there is some metaphysical doubt as to the material

20   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

21   nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct.

22   1356 (citation omitted).

23          On May 25, 2001, the court advised plaintiff of the requirements for opposing a

24   motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

25   F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.

26   Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

Material Facts

The following facts are undisputed, unless otherwise noted.  Plaintiff was

confined at Salinas Valley State Prison (SVSP) when the claims arose; he is currently confined at

Pleasant Valley State Prison (PVSP).  Defendants' Statement of Undisputed Facts (DUF), No. 1.

Plaintiff was a member of the Men's Advisory Council (MAC) at SVSP; MAC members advise

and communicate with the warden and other prison staff about matters of common interest and

concern to the inmate general population DUF, No. 2, citing CAL. CODE REGS. tit.xv, § 3230(a)(1).[11]

Plaintiff arrived at SVSP on July 19, 1996; over the next 29-month period,

plaintiff filed 46 grievances; often the same grievance was filed with the prison appeal office, the

warden's office and the office of inmate appeals simultaneously.  DUF, No. 3, citing Exh. B,

declaration of defendant SVSP chief deputy warden Harris and attachment 1, p. 3.[12]

Under CAL. CODE REGS. tit.xv, § 3084.4,[13] the CDC's Chief of Inmate Appeals could

---

[11] "§ 3230. Establishment of Inmate Advisory Councils.

(a) Each warden shall establish an inmate advisory council which is representative of that facility's inmate ethnic groups. At the discretion of the warden, subcommittees of the council may also be established to represent subfacilities or specialized segments of the inmate population. (1) Council members shall serve to advise and communicate with the warden and other staff those matters of common interest and concern to the inmate general population."

[12] This attachment, dated January 25, 1999, is a memorandum from defendant Harris directed to plaintiff's December 22, 1998 communication "regarding inmate safety and the appeal process at Salinas Valley State Prison."

[13] "§ 3084.4. Appeal System Abuse.
(a) Excessive filings. One appellant's submission of more than one non-emergency appeal within a seven-calendar-day period shall be considered excessive.
(1) When an appellant submits excessive appeals, the first appeal received shall be processed normally and all subsequent non-emergency appeals filed within the seven-calendar-day period by that individual shall be suspended.
(2) The appeals coordinator shall consult with the chief, inmate appeals, who shall determine further action to be taken on the suspended appeals.
(3) Upon determination of abuse, the chief, inmate appeals, shall authorize the appeals coordinator to prepare a notice restricting the inmate to one appeal per month for six consecutive months.
(4) Any subsequent violations of the appeal restriction shall result in an extension of the restriction for an additional six month period."  (Subsections (b)-(d) not included).

restrict an inmate to the filing of one non-emergency appeal per month for six consecutive

months in a case where the inmate had abused the grievance procedure by filing more than one

non-emergency appeal within a seven-calendar day period or committed other violations.  DUF,

No. 4.  On December 22, 1998, plaintiff sent a letter to the CDC director, the SVSP warden, the

chief of inmate appeals, and the SVSP appeals coordinator, complaining about various safety

issues concerning Hispanic inmates and the failure to process on an emergency basis a grievance

submitted on November 6, 1998, regarding those issues.  DUF, No. 5.  Exh. B, defendant Harris'

Dec., ¶ 2 and Attachment 2.

      Within defendant Harris' January 25, 1999 memorandum (see footnote 12), Harris

states that the memo is in response to plaintiff's letters "to the Director of the California

Department of Corrections, the Chief of Inmate Appeals, the Appeals Office at Salinas Valley

State Prison (SVSP), and the SVSP Warden."  Plaintiff asserts that the 1/25/99 response by

defendant Harris ignores the concerns he had raised with respect his (plaintiff's) safety concerns,

including that he had been threatened by staff who were "trying to have him killed for his

activities as a prison litigator and Chicano activist."  Opp., p. 3.  Plaintiff includes no exhibits,

with the exception of an undated newspaper article from an unidentified publication, with his

opposition to defendants' motion.

      Although plaintiff does not directly dispute the number of grievances cited by

defendants in DUF No. 3, he asserts that defendant Harris, along with defendant Gagnon, had put

him on appeal restriction as their way "of shutting [plaintiff] up" because "they were tired of

plaintiff bringing in the FBI and judicial scrutiny to 'their prison.'"  Opp., p. 4.  Plaintiff also

claims that he was set up for an assault on August 4, 1999 and September 6, 1999, receiving

permanent physical injuries and that one of the otherwise unnamed officers who set him up, was

Steve Archibald an individual was a known member of a gang of prison guards and "a dirty cop."

Id.  Plaintiff submits no evidence in support these claims and does not even make it by way of

his attached declaration.  He has attached to his declaration an undated, unidentified and

otherwise unauthenticated press clipping, which refers, inter alia, to Steve Archibald, as a member of the "Green Wall" (prison guard gang) and a former employee in the SVSP investigative services unit, an individual not a defendant in this action. Plaintiff only otherwise refers to exhibits produced by defendants and does not even refer to those exhibits attached to his verified complaint, which the court will, nevertheless, consider, as appropriate.[14]

Within his declaration in support of his opposition, plaintiff refers the court to unspecified defendants' exhibits to their motion for evidence that defendants Gagnon, Harris and Larson subjected plaintiff to false disciplinary charges and ignored his requests for protection from gang members.[15] Plaintiff's dec., ¶ 7. Plaintiff's December 22, 1999 letter (attachment 2 to Harris dec.) referred to by defendant Harris in his January 25, 1999 memorandum alleges that the staff has been operating an unsafe prison, not adhering to the Plan of Operations by not escorting northern Latino prisoners being escorted to and from showers. As a result, according to plaintiff, two inmates were severely injured. Within the letter, plaintiff refers to an appeal about this staff failure with regard to safety, which should have been processed as an emergency but about which plaintiff had heard no word; plaintiff seeks an investigation into what has occurred to the

---

[14] In determining a motion to dismiss, the court may consider the face of the complaint itself and any exhibits attached to it and may take judicial notice of matters of public record, such as court orders. Schneider v. California Department of Corrections, 151 F.3d 1194, 1197 (9th Cir. 1998); Shaw v. Hahn, 56 F.3d 1128, 1129 n. 1 (9th Cir.), cert. denied, 516 U.S. 964, 116 S. Ct. 418 (1995).

[15] Attached to his verified complaint, plaintiff includes as an exhibit a 602 inmate appeal, dated 5/5/98, which plaintiff identifies as an "emergency appeal," concerning the allegedly threatening and assaultive behavior by an officer, not a defendant herein, against whom plaintiff had filed a grievance for an alleged earlier physical assault by this correctional officer upon plaintiff (as well as misconduct by other non-defendant C/Os). Also included is a May 3, 1998 CDC 115 hearing on a Rules Violation Report written by this non-defendant, C/O Freitas, accusing plaintiff of disobeying orders, for which plaintiff was found guilty but for which the offense was reduced to an administrative CDC-115. The transcript of the hearing submitted by plaintiff includes several inmate witnesses and witness affidavits who support plaintiff's version of events and contest the Freitas' account. However, no defendant herein authored the RVR or appears to have conducted the CDC 115 hearing or otherwise been involved. Defendant Harris did provide and sign the second level appeal, dated 10/1/98, referring plaintiff's appeal to the Investigative Services Unit (ISU). Defendant Melching denied the third level appeal, on 2/11/99, stating that the appeal had been appropriately referred to ISU.

underlying appeal.[16]

On January 6, 1999, plaintiff submitted a grievance (SVSP Log No. 99-0061) complaining about various inadequacies in the grievance procedure at SVSP.   DUF, No. 6.  Exh. A, Declaration of Paul Sanchez, PVSP Litigation Coordinator, Attachment 1, pp. 7-15.  The appeal stated that defendant Gagnon, SVSP appeals coordinator, had met with the MAC on July 29, 1998 to discuss those same issues, but that the problems had not been corrected.   Id., p. 7.

Plaintiff does not dispute the July 28, 1998 meeting, but avers that he met with both defendants Gagnon and Harris on that occasion about the allegedly inadequate SVSP appeal system.  Opp., p. 3.  Plaintiff asserts that he filed the administrative appeal defendants' included as Attachment 1 to defendants' Exh. A, citing pages, 7-16 (defendants' cited pages 7-15, page 16 is plaintiff's 602 grievance as to the appeal restriction on which he was ultimately placed that gives rise to this action).   That appeal concerns the MAC Executive Body meeting on July 29, 1998 with defendant Gagnon (a memorandum of the 7/29/98 meeting is at pp. 11-12); plaintiff makes no mention of defendant Harris in a 602 grievance, dated January 6, 1999, where several inadequacies of the SVSP appeal system were discussed but which had apparently not been subsequently addressed.[17]

---

[16] As exhibits to his complaint, plaintiff includes a November 6, 1998 appeal, which makes no request that the appeal be treated as an emergency, wherein plaintiff complains that he should not be classified as a Latino gangmember when he is non-affiliated, and a November 16, 1998 appeal, wherein plaintiff seeks emergency status for his appeal as to why no escort was provided to showers during a lockdown of Northern Hispanic inmates, apparently resulting in an attack on an inmate.  In the January 25, 1999 memorandum, defendant Harris addresses the November 6, 1998 appeal but appears not to be aware of the separate and subsequent November 16, 1998 appeal.

[17] Plaintiff alleges therein, inter alia, that informal level appeals are not being responded to timely or at all, nor are appeals to the appeals office.  Staff shortages are causing appeal delays.  No plan has been implemented to provide to assist the illiterate, handicapped or non-English speakers with appeal preparation.  Prison staff continue to retaliate against those who submit complaints against them.  Complaints referred to the Investigative Services Unit take months to process, which can cause statute of limitations problems.  Inmates are not sufficiently informed as to the result of any investigation.  Some departments allow staff to address complaints against themselves, a practice defendant Gagnon had said would be stopped.  The SVSP appeal system deprives inmates of their right of access to the courts because under the

1          As part of their DUF No. 6, defendants set forth that, under state prison

2    regulations, MAC representatives are not allowed, as council representatives, to become involved

3    with inmate appeals unless the matter affects the general inmate population and the

4    representative's involvement is authorized by the warden.   Cal. Code Regs. tit. 15, § 3230(d).[18]

5    Although an inmate was permitted to file a grievance on issues affecting a group of inmates, the

6    grievance had to be accompanied by a list containing the names and signatures of all inmates

7    participating in the grievance.  Cal. Code Regs. tit. 15, § 3084.2(f)(1).[19]   Plaintiff does not

8    address the regulations cited by defendants and does not contend that he met the specifications of

9    these regulations, i.e., that his involvement in this group appeal was authorized by the warden or

10   that the grievance on behalf of the group that he filed contained a list with the names and

11   signatures of those inmates who were a part of the group grievance.

12          In his January 25, 1999 response to plaintiff's six letters sent in the preceding

13   month regarding various issues, including plaintiff's December 22, 1998 letter, defendant Harris

14   told plaintiff that the grievance submitted on November 6, 1998 had been screened out because it

15

16   PLRA prisoners must exhaust administrative remedies before bringing suit.
           A partially granted second level appeal response by defendant Harris (to the 1/6/99

17   appeal) is dated February 22, 1999, indicating that an appeals coordinator was assigned to
     investigate the appeal at the second level.  Each issue is reiterated and addressed therein

18   (although, no doubt, not to plaintiff's satisfaction), for example, although it is acknowledged that
     there are overdue second level responses, more staff have been assigned, according to the

19   defendant Harris, to make timely first level responses.   Defendant Harris asserts that the prison
     is not required to provide assistance to inmates in filing grievances beyond whatever assistance

20   has been provided but that inmates may provide help to other inmates.  No documentation, the
     response states, supports the allegations of retaliation or with respect to inmates being denied

21   their right of access to the courts.

22          [18] "Inmate advisory council representatives shall not, as a council representative, become

23   involved with inmate appeals unless the matter affects the general inmate population and such
     involvement is authorized by the warden."

24          [19]"Group appeal. If a group of inmates intend to appeal a decision, action, or policy

25   affecting all members of the group, one appeal form with the name and departmental
     identification number of the inmate who prepared the appeal shall be submitted.

26   (1) A legible list of the participating inmates' names, signatures, departmental identification
     numbers, and housing shall be attached to the appeal."

1   did not meet the requirements for emergency processing under prison regulations.  DUF, No. 7,

2   Exh. B, Harris dec. at ¶¶ 2- 3 and Attachment 1.  Plaintiff was told to obtain an informal response

3   because the entire facility was on lock down status; therefore, there was no threat to his safety or

4   threat of serious or irreparable harm.  Id.

5          Defendant Harris also advised plaintiff that he had abused the appeals process in

6   the months since his arrival at SVSP and that, given his knowledge of the appeals system, he

7   appeared to be trying to undermine the process.   Exh. B, Harris dec., ¶ 4 and Attachment 1.

8   Defendant Harris told plaintiff that it was not in his best interests or that of the other 4,000

9   inmates at the prison.   Defendant Harris reminded him of the proper procedures to be followed

10  in presenting grievances and urged plaintiff to follow them.  Id.  DUF, No. 8.

11         A week later, on February 1, 1999, defendant Gagnon, an appeals coordinator at

12  SVSP, screened out a grievance plaintiff had filed because it was not on a CDC 602 form.

13  Defendants' Exh. C, Declaration of N. Grannis, CDC Chief of Inmate Appeals, Attachment 2,

14  see also Cal. Code. Reg. tit. xv, § 3084.2(a).[20]  DUF, No. 9.

15         On February 4, 1999, two more of plaintiff's grievances were screened out

16  because they duplicated issues raised in previously filed appeals.   Exh. C, Grannis dec.,

17  Attachment 3.  DUF, No. 10.  As to this point, plaintiff asserts that defendants had instructed

18  plaintiff and other inmates to submit an appeal to the appeal office if the department or staff

19  member refused to reply to the first appeal submitted.  Opp., p. 5.  He avers that this issue was

20  discussed with defendants Gagnon and Harris at the July 29, 1998 meeting.  A review of the July

21  29, 1998 memorandum, included in Attachment 1 to the Sanchez dec., directed to Facility A staff

22  and the general population concerning the MAC meeting with Team III and signed by several

23  SVSP prison staff (all non-defendants) includes, inter alia, the following:

24  _____

25      [20] "Form requirement. The appellant shall use a CDC Form 602 (rev. 12-87),
    Inmate/Parolee Appeal Form, to describe the problem and action requested. Initial requests or
    grievances based on a disability as defined in Title 42, U.S.C. section 12102 shall be filed
26  pursuant to section 3085."

As of 11-96, new regulations concerning Inmate 602 appeals, states that the appeals office has (10) working days to answer any appeal. A suggestion made by Ms. Gagnon was that any inmate filing a 602 appeal should make a copy of his 602 and date it. When an inmate appeal has gone pass [sic] the (10) days response period, the appealing inmate should immediately re-file his 602, adding a copy of his original appeal and clearly stating that his orginal [sic] 602 is late. This will be noted by the Appeals Office and the (1st) level will be by-passed.

Plaintiff does not point in his opposition to specific instances when he pursued this procedure and nevertheless had an appeal screened out as a result.

On February 16, 1999, Defendant Gagnon sent plaintiff a memorandum stating that he had not followed proper procedures in submitting two letters to the warden (dated January 26, 1999,[21] and February 3, 1999), rather than submitting his complaints on a CDC 602 form. Exh. C, Grannis Dec., Attachment 4. Defendant Gagnon told plaintiff that the warden would not respond to those letters because plaintiff had not followed the proper procedures, but that all grievances properly submitted would be reviewed and answered.[22] Id. DUF, No. 11.

Because of plaintiff's continued abuse of the appeals process and refusal to comply with prior warnings, defendant Harris asked defendant Melching, the Chief of Inmate Appeals, on February 16, 1999, to approve an appeal restriction limiting plaintiff to filing one nonemergency grievance a month for six months. Defendants' Exh. B, defendant Harris' dec., ¶¶ 5-6 and Attachment 4. DUF, No. 12. Plaintiff disputes this point, adamantly stating that "defendants manufactured false evidence of plaintiff's administrative appeal history and submitted this in a memo form dated 2-16-99, so that defendant Melching can [sic] place plaintiff on appeal restriction." Opp., p. 5. Plaintiff goes on to argue that, while defendants have produced a computer generated read-out of plaintiff's appeals, they have never produced a single

---

[21] Defendants asserted that this date was January 26, 1999, and defendant Gagnon's Feb. 16, 1999 memorandum indicates that was the date of plaintiff's letter; however, the letter, itself, is dated January 27, 1999. See defendants' Exh. C, Attachment 4.

[22] Actually, in the memorandum, defendant Gagnon states that plaintiff's submitted inmate appeals have been reviewed and answered, not that they would be.

1   instance of the actual appeals for which he was deemed to be abusing the appeal process, despite

2   having been pressed to do so by plaintiff and this court.   Opp., pp. 5-6.  Plaintiff appears to be

3   referencing, although he does not so state, an Order filed on July 29, 2003, wherein, upon

4   plaintiff's motion to compel discovery, the court directed defendants to identify and produce

5   "those specific documents which defendants have deemed to have constituted plaintiff's abuse of

6   the appeal process...." within twenty days, after which defendants sought and received one

7   twenty-day extension of time to do so.  See Order, filed on July 29, 2003, p. 10; and Order, filed

8   on August 28, 2003.[23]  Although plaintiff does not specify the response provided by defendants, a

9   review of the court's file appears to indicate that in response to the July 29, 2003 Order,

10  defendants provided only an appeals abuse warning in a memorandum from the Appeals

11  Coordinator at CSP-LAC, dated February 5, 2003, directed to plaintiff and cautioning him as to

12  filing of three non-emergency 602 appeals filed on February 3, 2003, calling it his "first warning"

13  as to abuse of the grievance system.  See plaintiff's Exh. G to his motion for summary judgment,

14  filed on October 1, 2003 and denied by Order filed on September 30, 2004.[24]  Of course, such a

15  warning dated significantly beyond the time that the appeal restriction placed on plaintiff herein

16  is not, strictly speaking, relevant to this action, although it arguably goes some distance to show a

17  continuing pattern of excessive grievance filings on the part of plaintiff.

18          On February 22, 1999, defendant Harris responded to plaintiff's

19  grievance regarding problems with the grievance system at the second level.   Defendants' Exh.

20  A, Sanchez dec., Attachment 1, pp. 13-15.  Plaintiff did not appeal to the Director's level.

21

22      [23]  Defendants had been informed that the thousand plus pages (among which a third were
    apparently duplications) they had provided to plaintiff were not responsive to plaintiff's request
23  for the specific appeals that served as the basis for the appeal restriction.  See Order, filed on July
    29, 2003, pp. 3-4, 6-7.
24

25      [24]  The cautionary memo references CAL. CODE REGS. tit.xv, § 3084.4(a), wherein more than
    one non-emergency appeal within a seven-calendar-day period is deemed "excessive."  This
    memorandum was noted in the Order and Findings and Recommendations, pp. 9-10, filed on
26  July 14, 2004, adopted by Order, filed on September 30, 2004.

1   Defendants' Exh. A, Attachment 1, p. 8.  DUF, No. 13.

2          On February 24, 1999, Defendant Melching authorized the restriction.

3   Defendants' Exh. B, defendant Harris' dec., ¶ 6 and Attachment 5.  DUF, No. 14.

4          On February 25, 1999, defendant Gagnon sent plaintiff a memorandum informing

5   him of the appeal restriction and attached a copy of the February 24, 1999, memorandum from

6   Melching.  Defendants' Exh. C. Grannis dec., Attachment 5.  DUF, No. 15.

7          On March 9, 1999, plaintiff submitted a grievance complaining about the appeal

8   restriction and alleging that it was in retaliation for his previous grievances.  Defendants' Exh. A,

9   Sanchez dec., Attachment 1, pp. 16-27.  DUF, No. 16.   Plaintiff asserts in that grievance as he

10  does in his opposition, that the appeal restriction was placed on him to deny his right of access to

11  the courts and because in his capacity as a MAC member he submitted complaints of civil rights

12  abuses, including claims of excessive force to other agencies such as the F.B.I., resulting is

13  federal investigations of staff corruption at SVSP.  Plaintiff avers without providing any

14  supporting documentation that reprisals in retaliation for his litigation activities included an

15  F.B.I. investigation into the actions of defendants' "agents" who "tried to hire other prisoners to

16  kill [plaintiff]."  Plaintiff's dec. in Opp., ¶ 11.

17          Defendants state that "consistent with his pattern of filing duplicative

18  complaints," plaintiff also submitted a letter on March 11, 1999, to defendants Terhune and

19  Melching complaining about the appeal restriction.  Exh. A, Sanchez Dec., Exh. 1, p. 23.

20  Defendant Melching returned the letter to plaintiff on March 29 with an instruction that it should

21  be presented with an appeal log number to the appeals coordinator and that the complaint

22  required review at the second level before being sent to her for third-level review.   Defendants'

23  Exh. A, Sanchez dec., Attachment 1, p. 24.  DUF, No. 17.

24          On May 5, 1999, defendant Larson, the Acting Warden at SVSP, responded to the

25  grievance on the appeal restriction at the second level.  Defendants' Exh. A, Sanchez dec.,

26  Attachment 1, pp. 20-22.  Defendant Larson granted plaintiff's request to provide a copy of the

1   February 16, 1999, memorandum and supporting documents, but denied his request to rescind

2   the appeal restriction.  Id.   Defendant Larson told plaintiff that the appeal restriction was not

3   based on his activity as a MAC representative.  Id.

4           Plaintiff appealed to the Director's level on May 26, 1999.  Defendants' Exh. A,

5   Sanchez dec., Attachment 1, p. 17.  The grievance was denied at that level on November 30,

6   2000.  Id. at pp. 25-27.  DUF, No. 19.

7           In the years following the six-month appeals restriction in 1999, plaintiff  has

8   submitted almost 100 grievances. Defendants' Exh. C, Grannis dec., Attachment 1. DUF, No.

9   20.  Plaintiff does not address or dispute this point.

10          Although plaintiff does not specifically dispute the facts of the processing of his

11  grievance, plaintiff's averments make clear that he believes the defendants engaged in a

12  conspiracy to deprive him of his right to access the courts in violation of due process and in

13  retaliation for his having persistently pointed out the inadequacies of SVSP grievance system in

14  his MAC capacity and to curb his litigation and written complaints to federal and state officials

15  complaining of mistreatment of prisoners.  See Opp., and plaintiff's dec., ¶¶ 13-14.  To the extent

16  that plaintiff, by his opposition, seeks to bootstrap additional claims, plaintiff has previously be

17  cautioned:

18          The gravamen of plaintiff's complaint is that plaintiff's
            constitutional right of access to the courts was denied when
19          plaintiff was placed on inmate appeal restriction (and that he was
            placed on such restriction in part in retaliation for filing inmate
20          grievances in his MAC capacity).  Plaintiff's effort to bootstrap a
            deliberate indifference claim into the pending action, as by his
21          reference to his appeals with regard to Latino gangmembers by
            letter, inmate appeal, oral communication or other means [...]is
22          unavailing.

23          .........................................................................................
            The retaliation plaintiff averred in his complaint came in the form
24          of denying him access to the courts; his complaint does not allege
            that defendants' retaliatory conduct took the form of subjecting
25          him to gang violence by their unresponsiveness.

26  See Order and Findings and Recommendations, filed on July 29, 2003, p. 6, adopted by Order,

27

1    filed on September 12, 2003.

2    Discussion

3        *Due Process*

4            As to plaintiff's claims that he is denied to due process (or a right of access to the

5    courts) with respect to the failure of the defendants to process his appeals, defendants are correct

6    that there is no constitutional right to an inmate appeals process.  Prisoners do not have a

7    "separate constitutional entitlement to a specific prison grievance procedure."  Ramirez v.

8    Galaza, 334 F.3d 850, 860 (9th Cir. 2003), citing Mann v. Adams, 855 F.2d 639, 640 (9th Cir.

9    1988).  Even the non-existence of, or the failure of prison officials to properly implement, an

10   administrative appeals process within the prison system does not raise constitutional concerns.

11   Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988).  See also, Buckley v. Barlow, 997 F.2d 494,

12   495 (8th Cir. 1993); Flick v. Alba, 932 F.2d 728 (8th Cir. 1991).  Azeez v. DeRobertis, 568 F.

13   Supp. 8, 10 (N.D.Ill. 1982) ("[A prison] grievance procedure is a procedural right only, it does

14   not confer any substantive right upon the inmates.  Hence, it does not give rise to a protected

15   liberty interest requiring the procedural protections envisioned by the fourteenth amendment").

16   Specifically, a failure to process a grievance does not state a constitutional violation.  Buckley,

17   supra.  State regulations give rise to a liberty interest protected by the Due Process Clause of the

18   federal constitution only if those regulations pertain to "freedom from restraint" that "imposes

19   atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

20   life."  Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300 (1995).[25]  Defendants' motion

21

22        [25] "[W]e recognize that States may under certain circumstances create liberty interests
     which are protected by the Due Process Clause. See also Board of Pardons v. Allen, 482 U.S.
23   369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these interests will be generally limited to
     freedom from restraint which, while not exceeding the sentence in such an unexpected manner as
24   to give rise to protection by the Due Process Clause of its own force, see, e.g., Vitek v. Jones,
     445 U.S. 480, 493, 100 S.Ct.1254, 1263-1264 (transfer to mental hospital), and Washington, 494
25   U.S. 210, 221- 222, 110 S.Ct. 1028, 1036-1037 (involuntary administration of psychotropic
     drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the
26   ordinary incidents of prison life." Sandin v. Conner, supra.

28

1    should be granted on the ground that plaintiff's due process rights were violated when he was put

2    on appeal restriction.

3            *Right of Access to the Courts*

4            Plaintiff claims that he was deprived of his constitutional right to access the courts

5    by the inmate appeal restriction because, under the Prison Litigation Reform Act (PLRA),

6    inmates are required to exhaust administrative remedies before proceeding to federal court.  The

7    PLRA, 42 U.S.C. § 1997e(a) provides that, "[n]o action shall be brought with respect to prison

8    conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail,

9    prison, or other correctional facility until such administrative remedies as are available are

10   exhausted."  Inmates seeking injunctive relief must exhaust administrative remedies.  Rumbles v.

11   Hill, 182 F.3d 1064 (9th Cir. 1999).   In Booth v. Churner, 532 U.S. 731,121 S. Ct. 1819 (2001),

12   the Supreme Court held that inmates must exhaust administrative remedies, regardless of the

13   relief offered through administrative procedures.  532 U.S. at 741, 121 S. Ct. at 1825.  Therefore,

14   inmates seeking money damages must also completely exhaust their administrative remedies.

15   Booth v. Churner, 532 U.S. 731, 121 S. Ct. 1819 (inmates seeking money damages are required

16   to exhaust administrative remedies even where the grievance process does not permit awards of

17   money damages).  Further, 42 U.S.C. § 1997e(a) provides that no action shall be brought with

18   respect to prison conditions *until* such administrative remedies as are available are exhausted.

19   McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002) ("a prisoner does not comply" the

20   requirement of § 1997(e)(a) "by exhausting available remedies during the course of the

21   litigation").

22           Nevertheless, plaintiff does not demonstrate how his access to the courts has been

23   curtailed or denied by the appeal restriction.  In the first place, plaintiff does not identify an

24   actual injury.  Lewis v. Casey, 518 U.S. 343, 351-53, 355, 116 S.Ct. 2174 (1996) (prisoner must

25   allege actual injury).  Second, in the instant case, when defendants brought a motion to dismiss

26   this action, one ground of which being that the action should be dismissed for failure to exhaust

1   administrative remedies before he filed his complaint, this court found that the motion should be

2   denied because prison officials appeared not to have followed their own regulations regarding the

3   time for processing administrative appeals and plaintiff had made an adequate showing of

4   sufficiently diligent efforts to process his appeals.  See Order and Findings and

5   Recommendations, filed on February 22, 2002, adopted by Memorandum and Order, filed on

6   April 23, 2002.  Finally, the Ninth Circuit has held that an inmate plaintiff had exhausted all

7   administrative remedies available to him under the PLRA "when he completed all avenues of

8   administrative review available to him." Ngo v. Woodford, 403 F.3d 620, 631 (9th Cir. 2005),

9   cert. granted by Woodford v. Ngo, 126 S. Ct. 647 (Nov. 14, 2005).  While Ngo, supra, addresses

10  an instance of an inmate appeal rejected as time-barred prior to the inmate's filing his federal

11  civil rights action, the Ninth Circuit therein requires that defendants demonstrate how the

12  plaintiff could have cured any failure to exhaust and rejected the concept that the PLRA

13  exhaustion requirement imports the procedural default doctrine.  That the Supreme Court intends

14  to review the decision renders it no less binding on this court in the interim.   Plaintiff has made a

15  wholly insufficient showing that the appeal restriction under which he was placed limited his

16  right to access the courts or "chilled" his right to do so.  Defendants motion should be granted on

17  this ground.

18        _Retaliation_

19        On the other hand, to the extent that an inmate appeal restriction or limit can be

20  construed as one, inmates do have a right to be free from the filing of false disciplinary charges in

21  retaliation for the exercise of constitutionally protected rights.  Pratt v. Rowland, 65 F.3d 802,

22  807 (9th Cir. 1995); Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir. 1995); Rizzo v. Dawson,

23  778 F.2d 527, 532 (9th Cir. 1985).  The Ninth Circuit treats the right to file a prison grievance as

24  a constitutionally protected First Amendment right.  Hines v. Gomez, 108 F.3d 265 (9th Cir.

25  1997); see also Hines v. Gomez, 853 F. Supp. 329 (N.D. Cal. 1994) (finding that the right to

26  utilize a prison grievance procedure is a constitutionally protected right, cited with approval in

1   Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995)); Graham v. Henderson, 89 F.3d 75 (2nd Cir.

2   1996) (retaliation for pursing a grievance violates the right to petition government for redress of

3   grievances as guaranteed by the First and Fourteenth Amendments); Jones v. Coughlin, 45 F.3d

4   677, 679-80 (2nd Cir. 1995) (right not to be subjected to false misconduct charges as retaliation

5   for filing prison grievance); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing

6   disciplinary actionable if done in retaliation for filing inmate grievances); Franco v. Kelly, 854

7   F.2d 584, 589 (2nd Cir. 1988) ("Intentional obstruction of a prisoner's right to seek redress of

8   grievances is precisely the sort of oppression that section 1983 is intended to remedy" (alterations

9   and citation omitted)); Cale v. Johnson, 861 F.2d 943 (6th Cir. 1988) (false disciplinary filed in

10   retaliation for complaint about food actionable) (overruled on other grounds by Thaddeus-X v.

11   Blatter, 175 F.3d 378 (6th Cir. 1999)).

12          In order to state a retaliation claim, a plaintiff must plead facts which suggest that

13   retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor

14   behind the defendant's conduct.  See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th

15   Cir. 1989).  The plaintiff must also plead facts which suggest an absence of legitimate

16   correctional goals for the conduct he contends was retaliatory.  Pratt at 806 (citing Rizzo at 532).

17   Verbal harassment alone is insufficient to state a claim.  See Oltarzewski v. Ruggiero, 830 F.2d

18   136, 139 (9th Cir. 1987).  However, even threats of bodily injury are insufficient to state a claim,

19   because a mere naked threat is not the equivalent of doing the act itself.  See Gaut v. Sunn, 810

20   F.2d 923, 925 (9th Cir. 1987).  Mere conclusions of hypothetical retaliation will not suffice, a

21   prisoner must "allege specific facts showing retaliation because of the exercise of the prisoner's

22   constitutional rights."  Frazier v. Dubois, 922 F.2d 560, 562 (n. 1) (10th Cir. 1990).

23          This is not to say that a vexatious grievance filer can never be punished.

24   Vexatious litigants may be the subject of court discipline, and the undersigned would find it

25   incongruous that while the courts can punish or deter vexatious filings, see Tripati v. Beaman,

26   878 F.2d 351, 352 (10th Cir. 1989); Wolfe v. George, 385 F. Supp. 2d 1004 (N.D. Cal. 2005),

1  prison officials may not. Indeed, the right to petition for grievances is not absolutely protected;

2  such a right has no greater protection than speech in general. Rendish v. City of Tacoma, 123

3  F.3d 1216 (9th Cir. 1997). In the prison context, one's free speech rights are more constricted

4  from what they would be on the outside. O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct.

5  2400 (1987). Again, plaintiff must show that the actions or omissions constituting the

6  "retaliation" served no legitimate penological goal.

7          The February 16, 1999 memo from defendant Harris, seeking to authorize

8  restricting plaintiff to one appeal a month for six months, sets forth, inter alia, that plaintiff had

9  filed 53 602 appeals between August 5, 1996 and February 9, 1999. MSJ, Exh. B, Attachment 4.

10  Attached to the memo are copies of the inmate appeal log for plaintiff's grievances during the

11  relevant period, indicating that between August of 1996 through February of 1999, plaintiff filed

12  more than 50 inmate grievances. Id. The log sheets also indicate that during that time, plaintiff

13  filed more than one grievance during a seven-day period during each year from 1996 through

14  1999, even more than one on a single day in some instances, e.g., two appeals on October 17,

15  1996; two appeals on December 19, 1996; two appeals on February 19, 1997; two appeals on

16  October 27, 1998, two appeals on February 4, 1999. Id. Moreover, the log sheets reveal that,

17  for example, plaintiff filed multiple grievances within a seven-day period, for example, one on

18  October 16, 1996, two on October 17, 1996, one on October 22, 1996; one on September 4, 1997

19  and one on September 10, 1997; one on March 3, 1998, one on March 6, 1998 and one on March

20  10, 1998; two on October 27, 1998 and another on October 30, 1998; one on November 12,1998,

21  one on November 13, 1998 and one on November 17, 1998; one on January 20, 1999 and one on

22  January 22, 1999; one on February 1, 1999, two on February 4, 1999 and one on February 9,

23  1999. Id. There is inadequate information provided by the log to demonstrate whether or not

24  any of these grievances could have constituted emergency appeals, presumably not limited by §

25  3084.4(a); nevertheless, plaintiff simply does not address the issue of the log, stating only that

26  that he has never been provided with the specific underlying appeals that constitute the basis for

1    the appeal restriction, conclusorily averring that the restriction was a result of retaliation and

2    conspiracy, and based on "manufactured" evidence.   Plaintiff, however, never specifically

3    refutes any of the dates and grievances logged by defendants or specifies the occasions in

4    opposition when the appeals may have constituted emergencies.   In the logs set forth,

5    accompanied by the grievances defendants have submitted herein, defendants have made a

6    showing of a legitimate penological interest having been served by the appeal filing restriction as

7    applied in his case and in evident compliance with prison regulations sufficient to shift the

8    burden to plaintiff to establish that a genuine issue as to any material fact with respect to a claim

9    of retaliation actually does exist.   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

10   U.S. at 586, 106 S. Ct. at 1356.   This, the plaintiff has failed to do.

11          Thus, the essentially unrefuted data of the prison appeal log defendants have

12   presented – with the filing dates of enumerated appeals and general subject area ("medical,"

13   "property," "legal," "living conditions") set forth – is adequate to defeat plaintiff's insufficiently

14   supported claim that his placement on appeal restriction for six months was retaliatory and that

15   he has adequately demonstrated an absence of legitimate correctional goals underlying the

16   restriction.  Pratt at 806 (citing Rizzo at 532).   Defendants are entitled to summary judgment on

17   plaintiff's claim of retaliation.

18          *Conspiracy*

19          Because plaintiff has not submitted evidence in opposition to defendants' motion

20   that demonstrates that there exists a genuine issue of material fact with respect to his claims of

21   denial of access to the courts or retaliation, he is unable to sustain a claim of conspiracy on this

22   motion for summary judgment; that is, plaintiff would have to demonstrate that the defendants

23   had conspired to deprive him of a constitutional right, but no such showing has been made.

24          In this case, plaintiff's claims against the defendants of their involvement in a

25   conspiracy to violate his rights under § 1983 fail because plaintiff has not demonstrated in the

26   face of defendants' showing, that they were supported by any but conclusory allegations.  Burns

33

1  v. County of King, 883 F.3d 819, 821 (9th Cir. 1989).  Plaintiff "must state specific facts to

2  support the existence of the claimed conspiracy" to violate his rights under 42 U.S.C. § 1983.  Id.

3  Vague and conclusory allegations are not sufficient to support a claim for civil rights violations

4  based on conspiracy.  Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982); see also Pena

5  v. Gardner, 976 F.2d 469, 471 (9th Cir. 1992).  Summary judgment is properly granted for

6  defendants on insufficiently supported claims of conspiracy.  Burns v. County of King, supra,

7  883 F.3d at 821.  The motion should be granted on plaintiff's claims of conspiracy.

8            Because the court has found that defendants are entitled to summary judgment as

9  a matter of law, the issue of qualified immunity need not be reached.

10           Accordingly, IT IS ORDERED that:

11           1.  Defendants' July 19, 2005 motion for leave to file their opposition to

12  plaintiff's motion for sanctions is granted; and

13           2.  Plaintiff's June 10, 2005 motion for the court to impose sanctions and issue an

14  order of contempt is denied.

15            IT IS HEREBY RECOMMENDED that defendants' motion for summary

16  judgment, filed on March 23, 2005, be granted and judgment be entered for defendants.

17           These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

19  days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22  shall be served and filed within ten days after service of the objections.  The parties are advised

23  \\\\\

24  \\\\\

25  \\\\\

26  \\\\\

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 2/16/06

4

5                                                    /s/ Gregory G. Hollows

6                                                    _____
                                                     GREGORY G. HOLLOWS
                                                     UNITED STATES MAGISTRATE JUDGE

GGH:009

7  vill1760.msj+

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26